FILED

2012 Mar-30  PM 03:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ACOUSTIC ARTISTRY LLC,** | ) | |
| | ) | |
| Plaintiff / Counter Defendant, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **2:10-cv-2194-AKK** |
| **PEAVEY ELECTRONICS** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| Defendant / Counter Claimant. | ) | |

## MEMORANDUM OPINION

On July 27, 2011, the court held a bench trial to decide the three "Phase I" issues in this litigation.  For the reasons stated more fully herein, the court finds that (i) Plaintiff Acoustic Artistry LLC ("AALLC") satisfies the standing requirement; (ii) AALLC owns all intellectual property rights in the Wakeblaster Speaker Project ("WakeBlaster"); and (iii) the WakeBlaster design constitutes a trade secret under Alabama law.

### I.    PROCEDURAL HISTORY

On August 12, 2010, AALLC filed a complaint against Peavey Electronics Corporation ("Peavey") relating to intellectual property rights in the WakeBlaster and alleging misappropriation of trade secrets, breach of contract, suppression, misrepresentation, promissory fraud, negligence, conversion, and unjust enrichment.  *See generally* doc. 1.  Stated simply, AALLC contends that Peavey is

wrongfully utilizing a trade secret, the WakeBlaster, rightfully owned by AALLC. *Id.* at 5-6.  Peavey answered and also asserted various counterclaims against AALLC including conversion, trespass to chattel, respondeat superior, and tortious interference.  *See generally* doc. 8.  Among other defenses, Peavey disputes that the WakeBlaster actually constitutes a trade secret under Alabama law; as such, the parties decided to bifurcate this litigation with Phase I primarily determining whether WakeBlaster satisfies the elements of a trade secret under the Alabama Trade Secrets Act.  *See* doc. 17.

On April 13, 2011, Peavey filed two related summary judgment motions pertaining to ownership rights in the WakeBlaster.  *See* docs. 38, 40.  First, Peavey argued that AALLC lacks standing in this litigation because AALLC "does not now, nor has it ever held a trade secret, or any interest, in the WakeBlaster speaker; instead, Scott Hanna, current President of [AALLC], who once had ownership of the WakeBlaster, is the only person with standing to bring this suit." Doc. 39, at 2.  Similarly, Peavey's second summary judgment motion asserts that "the evidence produced in this matter shows that only Scott Hanna had ownership of the WakeBlaster speaker; that is, until he voluntarily surrendered those rights to Peavey when he accepted employment with Peavey and executed the Agreement of Confidentiality and Cooperation on July 18, 2008.  Based on the express terms of that Agreement, Peavey has ownership of all rights and interests in the subject WakerBlaster speaker."  Doc. 41, at 2.  After the parties briefed these motions, *see* docs. 50, 51, 55, 56, the court found that genuine issues of material fact remained

for Phase I, and denied the motions.  Doc. 63.

Accordingly, the court held a bench trial to determine whether the WakeBlaster constitutes a trade secret with corresponding property rights, and if so, whether AALLC possesses any ownership rights in the WakeBlaster.  After the bench trial, the court allowed the parties to submit post-trial briefs.  *See* docs. 73, 74, 75, 76.  The issues underlying Phase I of this litigation are now ripe for review.

## II.   FINDINGS OF FACT

Scott Hanna became employed with Acoustic Artistry, LLC (Delaware) in 1995, when he joined partners Paul Peace, James Johnson, and Chris Rogers to provide audio and video systems for large-venue performing arts centers and churches.  Doc. 69, at 17.  Two years later, Scott Hanna also joined Sonic Associates' IMAX sound division.  In the summer of 2001, Scott Hanna's wife, Syndi Hanna, conceptualized a type of speaker for wakeboarding and waterskiing. *Id.* at 18-22, doc. 70, at 12-15.  The crux of this idea centered on allowing music to be projected from the towing boat to a water skier or wakeboarder throughout the full arc of the skier's path without spraying "the boat cockpit with high levels of [sound] energy."  Doc. 69, at 20-21.  Scott Hanna and his partners at Acoustic Artistry LLC (Delaware) began developing a prototype speaker, or the WakeBlaster, based on Syndi Hanna's conceptualization.  *Id.* at 20-26.  They performed field testing and collected data to develop a speaker that would obtain the desired result.  This data included distance and range of sound based on differing angles and degrees of the speaker's horn pattern.  *Id.* at 24; P. Trial Exh.

7.  Scott Hanna and his partners entered this data into the "Autocad" program which Scott Hanna eventually used to create clay and fiberglass models of the prototype speaker.  Doc. 69, at 29-30; P. Trial Exh. 8, 9.  The WakeBlaster utilized a horn-in-horn coaxial speaker system with both two-way and three-way frequency prototypes.  Doc. 69, at 233-235.  The horn-in-horn speaker is not unique to the WakeBlaster and this speaker type exists in the public domain, *id.* at 254-55; doc. 70, at 79; however, the WakerBlaster offers a unique product with its directional sound model for use during water sports.  Doc. 70, at 83, 93, 179-80, 196.

In 2005, Acoustic Artistry LLC (Delaware) began marketing the WakeBlaster prototype.  Doc. 69, at 44-50.  Scott Hanna first cold-called Extreme Marine Corporation ("XTP") and demonstrated the 3-way horn prototype to XTP engineer Tony Williams.  *Id.* at 48.  In order to protect their design, Acoustic Artistry LLC (Delaware) attempted to build the WakeBlaster prototype such that even an experienced sound engineer would not be able to ascertain the speaker configuration during demonstrations.  *Id.* at 46-47.  XTP and Acoustic Artistry LLC (Delaware) also executed a Confidentiality and Nondisclosure Agreement specifically stating that the WakeBlaster speaker design and horn design were confidential information protected by the Agreement.  P. Trial Exh. 11.  XTP became interested in the 2-way horn WakeBlaster prototype, and Acoustic Artistry LLC (Delaware) disclosed this design information to XTP.  Doc. 69, at 50. Ultimately, negotiations broke down, and XTP returned all exchanged property to Acoustic Artistry LLC (Delaware).  *Id.* at 58.

At the end of 2006, Scott Hanna also met with Tim Tardo, a Peavey employee, to demonstrate the WakerBlaster prototype.  *Id.* at 71-72.  After hearing this demonstration and viewing the external WakeBlaster product, Tardo—an engineer with 22 years of experience—subsequently stated at trial that "I would be able to replicate it.  Obviously, not knowing the exact numbers, I couldn't reproduce it.  I could replicate it though."  Doc. 70, at 68, 177.  Tardo and Scott Hanna began discussing a business relationship between Acoustics Artistry LLC and Peavey, focusing on marine acoustics and sound systems.  Doc. 69, at 73-75; doc. 70, at 93-94.  Moreover, Scott Hanna informed Tardo of his possible separation from Acoustics Artistry LLC (Delaware).  Accordingly, Scott Hanna stated in an email that "Auditoria is a division of Acoustic Artistry.  Auditoria has just recently incorporated and the two will split.  I will take Acoustiv[sic] Artistry."  P. Trial Exh. 19.  On January 27, 2007, Scott Hanna signed a Confidentiality Agreement on behalf of Acoustic Artistry LLC (Delaware) regarding the WakeBlaster prototype, and Hartley Peavey, the CEO of Peavey, signed this Agreement on February 21, 2007.  P. Trial Exh. 20.

On February 2, 2007, Scott Hanna, Paul Peace, and Steve McKay—the then current members of Acoustic Artistry LLC (Delaware)—executed a Separation Agreement for that company.  Doc. 69, at 61; P. Trial Exh. 18.  This agreement converted Acoustic Artistry LLC (Delaware) into Auditoria, Inc., and transferred to Scott Hanna "all right, title and interest" that Acoustic Artistry LLC (Delaware) owned in the WakeBlaster project.  The agreement also transferred to Scott Hanna

"all right, title and interest" in the "Acoustic Artistry" name. *Id.* The members of Acoustic Artistry LLC (Delaware) initiated the separation because Scott Hanna wanted to move into the marine acoustics market whereas the other members wanted to focus on audio/video installation. Doc. 70, at 4-5. Therefore, the separation agreement allowed Scott Hanna to take sole interest in any rights owned regarding the Acoustic Artistry name and WakeBlaster project. *Id.*

On the same day, February 2, 2007, Scott and Syndi Hanna created AALLC, an Alabama limited liability company, by signing the AALLC Articles of Organization. Doc. 69, at 60, 67; doc. 70, at 19; P. Trial Exh. 21. AALLC's stated purpose, among other things, included audio/video consulting and intended licensing of intellectual property, such as the WakeBlaster. Doc. 69, at 67; P. Trial Exh. 21. Concurrently with creating AALLC, Syndi transferred her 50% ownership interest in the WakeBlaster to AALLC. Doc. 70, at 19-21. Scott Hanna transferred his interest in the WakeBlaster immediately after signing the Separation Agreement. Doc. 69, at 64-65, 254; doc. 70, at 5-7.

Throughout 2007, Scott and Syndi Hanna, as agents of AALLC, maintained an email correspondence with Tim Tardo of Peavey regarding the WakeBlaster prototype and a possible business venture between Peavey and AALLC. *See* doc. 69, at 84-128; P. Trial Exh. 22, 23, 24, 27, 29, 30, 31, 32, 33; doc. 70, at 93-94. The Hannas made clear to Tardo that they represented AALLC. Doc. 70, at 194-95. Moreover, on various occasions, AALLC addressed the confidentiality of the WakeBlaster design with Tardo, *see* P. Trial Exh. 23, 24, 26, and relying on this

confidentiality agreement, AALLC disclosed certain design specifications to Tardo, *see, e.g.*, doc. 69, at 88, 92, 126; doc. 70, at 22, 97, 174.  Additionally, Tardo explored production of the WakeBlaster project with a manufacturing contact in China.  *See* doc. 70, at 98-99.

In 2007 and 2008, AALLC also attempted to market the WakeBlaster prototype to other manufacturers through various demonstrations, and even incorporated the "Peavey" name with permission from Peavey executives.  Doc. 69, at 149-155, 238; doc. 70, at 34.  While AALLC demonstrated the WakeBlaster to other boat manufacturing entities such as MasterCraft, *see* doc. 70, at 109, AALLC never obtained confidentiality agreements because these exhibitions offered only speaker sound demonstrations.  Doc. 69, at 239-40.  No entity—outside of Peavey—agreed to manufacturer the product.  However, AALLC manufactured and sold two custom WakeBlaster speakers to a friend and family member of Scott and Syndi Hanna.  Doc. 70, at 50.

Eventually, Peavey hired Scott Hanna as Project Manager of its newly formed marine division, doc. 69, at 180-81, 186, and Hanna signed an Agreement of Confidentiality and Cooperation with Peavey on July 18, 2008.  P. Trial Exh. 49.  This Agreement protected Peavey's right to confidential information received within the scope of employment and also contained an "Inventions prior to employment excepted" clause stating that any inventions conceived by the employee prior to his employment with Peavey should be described in "Schedule A."  The executed Agreement contained no inventions in the attached Schedule A.

*Id.*  However, Scott Hanna contends that he failed to list the WakeBlaster project in Schedule A because he signed the agreement individually, and AALLC actually owned this invention.  Doc. 69, at 182.

While employed with Peavey, Scott Hanna continued work on the production and manufacturer of the WakeBlaster prototype.  *See id.* at 186-193; doc. 70, at 99-100.  Tardo provided that Peavey hired Scott Hanna because "[t]here was a transition from [the WakeBlaster] being without a Peavey logo, Acoustic Artistry, to it's going to be a Peavey product.  And Scott came on board as the product manager to help that happen.  He was to spearhead it, set up - - you know, basically set it up . . . . We had to get the thing through the stages of development.  And it needed someone to spearhead that."  Doc. 70, at 116.  Tardo further claimed that this product became a Peavey product when Peavey hired Hanna and started materially changing the WakeBlaster.  *Id.* at 178-79.  Peavey began utilizing the WakeBlaster concept but altered the product's name ("HammRheadZ"), external covering, and certain internal materials for manufacturing and marketing costs.  *Id.* at 121-23, 166.

Ultimately, however, Peavey discharged Scott Hanna on August 12, 2009.  With the termination, Scott Hanna received an email from Michael Goggans, counsel for Peavey, stating that "[i]n your email, you allege that the wakeboard speaker designs incorporate intellectual property rights owned or otherwise retained by you.  Allow me to be very clear on this matter: all discoveries, concepts ideas, products, etc. that you developed while you were an employee of

Peavey belong solely to Peavey.  Further, you did not disclose any exempt ideas on the aforementioned Agreement, therefore, you waived the right to claim any of the products as having been developed prior to your time at Peavey.  As such, all concepts, ideas, etc. that are incorporated into the wakeboard speaker designs belong exclusively to Peavey.  We will aggressively pursue any violation of this Agreement and will seek an injunction and/or damages as appropriate."  P. Trial Exh. 53.  The "aforementioned Agreement" refers to the Agreement of Confidentiality and Cooperation Scott Hanna signed on July 18, 2008.  *See id.*; P. Trial Exh. 49.

Peavey has not sold a unit of the HammRheadZ speakers, doc. 70, at 157; however, Tardo found a potential for future sales, *id.* at 156.  Indeed, while Peavey's corporate representative Courtland Gray testified at trial that he "was not real convinced that this [the WakeBlaster] had a whole lot of revenue potential or profitability potential," doc. 70, at 212, the court finds such testimony not credible. At deposition, when asked about these speakers, Gray stated "[w]e thought it was something unique and different that would be good in the marketplace."  *Id.* at 223.  Gray further provided at deposition that these speakers offered "a bigger, more robust, beefier speaker than has typically been sold in the marine wakeboarding world."  *Id.* at 225.  Moreover, Peavey's initial advertisement for the HammRheadZ speaker provides "Wakeboarding fans can now enjoy the same experience on the water with our specifically designed HammRheadZ wakeboarding audio systems, which use a highly directional pattern that amplifies

your customers' experience without waking the neighbors."  P. Trial Exh. 54.  The
advertisement also asserts that "[t]raditional tower speakers lack efficiency and
waste sound by dispersing in a wide pattern;" whereas, "Peavey HammRheadZ
speakers force soundwaves into a horn increasing sound pressure level and
providing a tight coverage."  *Id.*

## III.   ANALYSIS

*A.    Standing and Ownership Rights*

The court first addresses AALLC's standing to bring this action.  "Article
III of the Constitution limits the judicial power of the United States to the
resolution of 'cases' or 'controversies.'  As part and parcel of the case or
controversy requirement, a litigant must have 'standing' before he may bring a
lawsuit in federal court."  *Saladin v. City of Milledgeville*, 812 F.2d 687, 690 (11th
Cir. 1987) (citations omitted).  "The essence of a standing question is whether the
plaintiff has alleged 'such a personal stake in the outcome of the controversy as to
assure that concrete adverseness which sharpens the presentation of issues upon
which the court so largely depends . . . .'"  *Id.* (quoting *Baker v. Carr*, 369 U.S.
186, 204 (1962)).  The parties agree that, here, AALLC must have some property
interest in the WakeBlaster to satisfy the standing requirement.  *See* doc. 72, at 1-
2; doc. 73, at 5-7.  And indeed, courts generally require ownership in an alleged
trade secret to satisfy standing's injury-in-fact element.  *See, e.g.*, *Faiveley Transp.
Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 115-16 (2d Cir. 2009) (holding that
plaintiff in a trade secret misappropriation case cannot establish standing unless he

can establish that he owned the trade secret).

Moreover, trade secrets, like other forms of property, are freely assignable and transferrable.  *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001-02 (1984) ("Trade secrets have many of the characteristics of more tangible forms of property.  A trade secret is assignable."); *Petroscan AB v. Mobil Corp.*, 79 F.3d 1166, at *5 (Table) (4th Cir. 1996) ("Trade secret rights are generally recognized as property rights.").[1]  Finally, as it relates to the procedure for transferring trade secret ownership rights, the court finds Alabama's Statute of Frauds inapplicable. Ala. Code § 8-9-2.[2]  Therefore, a court applying Alabama law may enforce a

---

[1] The court notes the Fourth Circuit Court of Appeals decision in *DTM Research, L.L.C. v. AT & T Corp.*, 245 F.3d 327, 332 (4th Cir. 2001), where the court held that "the inherent nature of a trade secret limits the usefulness of an analogy to property in determining the elements of a trade-secret misappropriation claim . . . . While the information forming the basis of a trade secret can be transferred, as with personal property, its continuing secrecy provides the value, and any general disclosure destroys the value.  As a consequence, one 'owns' a trade secret when one know of it, as long as it remains a secret."  Put differently, it appears that the Fourth Circuit requires an analysis of whether a trade secret actually exists before the issue of ownership can be discussed.

[2] Alabama's Statute of Frauds provides:

In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:

(1) Every agreement which, by its terms, is not to be performed within one year from the making thereof;

(2) Every special promise by an executor or administrator to answer damages out of his own estate;

(3) Every special promise to answer for the debt, default, or miscarriage of

transfer of trade secret rights even if such transfer is not memorialized in writing.

Here, AALLC produced sufficient evidence at trial to establish that, beginning on February 2, 2007, it properly owns any rights in the WakeBlaster design. The facts adduced at trial reveal that Syndi Hanna originally owned 50% of the property rights in the WakeBlaster, and she assigned these rights to AALLC on February 2, 2007. The evidence also demonstrates that upon the dissolution of Acoustics Artistry LLC (Delaware) on February 2, 2007, that company transferred any rights it owned in the WakeBlaster to Scott Hanna. Finally, Scott Hanna intended and properly transferred this interest in the WakeBlaster to AALLC

--------

another;

(4) Every agreement, promise or undertaking made upon consideration of marriage, except mutual promises to marry;

(5) Every contract for the sale of lands, tenements or hereditaments, or of any interest therein, except leases for a term not longer than one year, unless the purchase money, or a portion thereof is paid and the purchaser is put in possession of the land by the seller;

(6) Every agreement, contract or promise to make a will or to devise or bequeath any real or personal property or right, title or interest therein;

(7) Every agreement or commitment to lend money, delay or forebear repayment thereof or to modify the provisions of such an agreement or commitment except for consumer loans with a principal amount financed less than $25,000;

(8) Notwithstanding Section 7-8-113, every agreement for the sale or purchase of securities other than through the facilities of a national stock exchange or of the over-the-counter securities market.

Ala. Code § 8-9-2.

immediately after he signed the Acoustics Artistry LLC (Delaware) Separation Agreement.

Peavey argues, on the other hand, that Scott Hanna improperly "assigned" his rights in the WakeBlaster to AALLC because he never obtained the consent of Paul Peace and Steve McKay. *See* doc. 55, at 8 (incorporated by reference in doc. 73). Peavey cites the Separation Agreement language that "no party to this Agreement may assign or transfer its rights, duties or interests in or under this Agreement, by operation of law or otherwise, without the express written consent of the others . . . ." P. Trial Exh. 18, at *8. Put differently, Peavey argues that this Agreement gave Scott Hanna an interest in the WakeBlaster, but any future assignment of this interest required "the express written consent of Paul Peace and Steve McKay." Doc. 55, at 8. The court disagrees because it finds this "Assignments" clause ambiguous. The Separation Agreement provides for the transfer of numerous "interests" between Scott Hanna and the new company, Auditoria, Inc. Specifically, for example, Auditoria, Inc. gave Scott Hanna the rights to the WakeBlaster and the "Acoustic Artistry" name, as well as $30,000 in assets. In return, Scott Hanna transferred his remaining interest in Acoustics Artistry LLC (Delaware) to Auditoria, Inc. *See* P. Trial Exh. 18. The Agreement also arguably contains a clause that restricts the future fungibility of *all* transferred property. Indeed, under Peavey's interpretation of this "Assignments" clause, the Separation Agreement could conceivably require Scott Hanna to obtain the consent of Auditoria, Inc. before he transfers or spends the $30,000, and

Auditoria, Inc. requires Hanna's consent before it transfers any company assets. At best, this clause is ambiguous, and the court must look to the intent of the parties forming the contract.  *See F.T.C. v. Leshin*, 618 F.3d 1221, 1231 (11th Cir. 2010) ("A contract is ambiguous where it is susceptible to two different interpretations, each one of which is reasonably inferred from the terms of the contract.") (quotation marks and citation omitted); *BellSouth Mobility, Inc. v. Cellulink, Inc.*, 814 So. 2d 203, 216 (Ala. 2001) ("It is well settled that where there is uncertainty and ambiguity in a contract, it is the duty of the court to construe the contract so as to express the intent of the parties . . . [and] it is presumed that parties intend to make reasonable contracts; therefore, courts will give ambiguous contracts a reasonable construction.") (quotation marks and citations omitted).

As evidenced by the remaining language of the Separation Agreement and Scott Hanna's testimony at trial, *see* doc. 70, at 4-5, Auditoria, Inc. and Scott Hanna never intended the Separation Agreement to require Auditoria, Inc.'s consent before Scott Hanna could subsequently transfer his interests in the WakeBlaster.  Therefore, after Syndi and Scott Hanna transferred their interests in the WakeBlaster to AALLC on February 2, 2007, AALLC owned all potential rights to the WakeBlaster.  With such rights, AALLC maintains proper standing to file this action against Peavey for trade secret misappropriation.

As a corollary finding, because AALLC—as opposed to Scott Hanna—owned all rights to the WakeBlaster beginning on February 2, 2007, the court disagrees that Scott Hanna transferred any rights in the WakeBlaster to

Peavey when he failed to list it as a prior invention in Schedule A of the Agreement of Confidentiality and Cooperation he signed with Peavey in July 2008.  *See* P. Trial Exh. 49.  *See also* doc. 41.  Scott Hanna signed this Agreement with Peavey as an individual, and the court refuses to find that Peavey obtained any rights to the WakeBlaster design based on this contract, given its finding that AALLC properly maintained the property rights to the WakeBlaster.  Moreover, even if Peavey is correct that Scott Hanna individually owned the rights to the WakeBlaster, it is an invention previously known to Peavey and, as such, there was no need to list it since the Agreement clearly stated an employee's "inventions prior to employment" were "excepted."  P. Trial Exh. 49.  In other words, Peavey did not hire Scott Hanna with the condition that he transfer the rights to the WakeBlaster, and, in fact, Peavey's previous confidentiality agreement, P. Trial Exh. 20, assured him that he retained rights to his prior inventions.  Accordingly, it is disingenuous to now rely on a technicality to strip Scott Hanna of "his"—according to Peavey—intellectual property.  And indeed, the attempt is even more duplicitous given that Peavey dealt with AALLC, knew that Syndi Hanna was also an owner of AALLC, and knew that AALLC owned the rights to the WakeBlaster.

B.    *The WakeBlaster Trade Secret*

The court now considers whether the WakeBlaster actually constitutes a "trade secret" under Alabama law.  Section 8-27-2(1) of the Alabama Code defines "trade secret" as information that:

a. Is used or intended for use in a trade or business;

b. Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;

c. Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;

d. Cannot be readily ascertained or derived from publicly available information;

e. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and

f. Has significant economic value.

Ala. Code § 8-27-2.  *See also Ex parte Miltope Corp.*, 823 So. 2d 640, 644 (Ala. 2001).  The entity asserting the trade secret, here AALLC, has the burden to show that it satisfies all six elements.  *Public Sys., Inc. v. Towry*, 587 So. 2d 969, 971 (Ala. 1991); *Bell Aerospace Servs., Inc. v. U.S. Aero Servs., Inc.*, 690 F. Supp. 2d 1267, 1273 (M.D. Ala. 2010).  However, because Peavey acknowledges that AALLC satisfies the first two elements, *see* doc. 73, at 9, the court will limit its discussion to whether the WakeBlaster satisfies the remaining four elements.

*i. WakeBlaster not publicly known and not generally known in the trade business of the person asserting that it is a trade secret.*

While the parties dispute whether the proper "trade business" at issue is the limited "marine audio" industry, doc. 72, at 14, or the more general "sound reinforcement" industry, doc. 73, at 10, the court finds such distinction irrelevant, because AALLC's WakeBlaster design is not generally known in either industry.

The evidence demonstrates that the WakeBlaster's internal components are readily available products, *see* doc. 69, at 254-55; doc. 70, at 79; however, the information that combined these components in a unique manner to specifically service a wakeboarder's acoustic range behind a boat is not publicly known nor generally known information—even in the sound reinforcement industry. *See* doc. 69, at 235.  Indeed, Peavey found this information unique and potentially profitable within the sound reinforcement industry.  Tardo, a Peavey engineer with vast experience in the sound reinforcement industry, stated that he dealt with AALLC because of the WakerBlaster's marine application.  Doc. 70, at 83, 93-94. Courtland Gray, Peavey's COO, corroborated this sentiment.  *Id.* at 221-23. Furthermore, Tardo provided that he "would be able to replicate [the WakeBlaster].  Obviously, not knowing the exact numbers, I couldn't reproduce that.  I could replicate it, though," *id.* at 68, and that he could "make something very similar to [the WakeBlaster]," *id.* at 177.  Tardo also stated that achieving the WakeBlaster's specific purpose "would require some design work."  *Id.* at 196.

Alabama courts offer little guidance on the "not generally known in the trade business" element, but the official comments to Ala. Code § 8-27-2 provide some insight.  Namely, "[t]he information must be secret, that is, not known publicly or known generally within the trade or business concerned.  Paragraphs c, d, and e all follow from the requirement that to be a trade secret the information must be 'secret.'  If the information already is available to the public, or readily may be obtained by the public, then no public interest is served by imposing trade

secret protection." Ala. Code § 8-27-2, comment (a)(3). Moreover, the purpose of Alabama's Trade Secrets Act is "to protect individual property rights in trade secrets and, thereby, to foster the development of *new products* and technology in this state." *IMED Corp. v. Sys. Engineering Assocs. Corp.*, 602 So. 2d 344, 346 (Ala. 1992) (emphasis added). Finally, in *Buckley v. Seymour*, 679 So. 2d 220, 224 (Ala. 1996), the Alabama Supreme Court addressed Indiana's Uniform Trade Secrets Act which also requires that the trade secret information derive value "from not being generally known to, and not being readily ascertainable by proper means . . . ." *Id.* The court found no trade secret in the "paintless dent removal" technique at issue because numerous other auto-repair businesses performed this same technique and the purported "owner" of this trade secret actually utilized independent companies to train his employees how to perform the technique. *Id.* at 224-25. As such, the technique offered information readily ascertainable to the auto-repair industry and therefore unworthy of trade secret protection. *Id.*

   The facts differ here because AALLC sufficiently demonstrates a unique sound reinforcement concept for marine acoustics not readily available in the industry. Peavey fails to refute the availability of this information to the sound reinforcement industry when its chief engineer admits that he would need AALLC's data to reproduce the WakeBlaster. Moreover, there is no evidence that other sound reinforcement marine product manufacturers utilize the wakeboarder's arc pattern for directional acoustics. *See* doc. 70, at 179-80. In fact, Peavey's initial advertisement of the HammRheadZ speaker—the Peavey product derived

from AALLC's WakeBlaster prototype—focuses on this exact unique concept created by AALLC.  *See* P. Trial Exh. 54; *see also* doc. 69, at 17-20.  The Peavey advertisement maintains that "[t]raditional tower speakers lack efficiency and waste sound by dispersing in a wide pattern;" however, "Peavey HammRheadZ speakers force soundwaves into a horn increasing sound pressure level and providing a tight coverage pattern."  P. Trial Exh. 54.  Based on the evidence at trial, it is clear that, while the ingredients that compose the WakeBlaster design may be generally available within the sound reinforcement industry, the information uniting these ingredients for waterskiing and wakeboarding acoustics is, however, not generally known in the industry.

Peavey cites *Web Communications Group, Inc. v. Gateway 2000, Inc.*, 889 F. Supp. 316 (N.D. Ill. 1995) and *Precision Moulding & Frame, Inc. v. Simpson Door Co.*, 888 P.2d 1239 (Wash. Ct. App. 1995), to support its argument that no trade secret exists here, but these cases are distinguishable.  First, in *Web*, the court relied on Seventh Circuit precedent that the primary factor in determining whether a concept or idea is "not generally known or easily duplicated by the industry" is "'the amount of time, money, or effort involved' in developing the alleged trade secret."  *Id.* (quoting *Computer Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1075 (7th Cir. 1992)).  The plaintiff in *Web* testified that "it took him 'three, four hours, perhaps' of sketching drawings and folding paper to come up with the stepped insert at issue.  In addition, he testified that he did not consult with anyone, or seek assistance in developing the stepped insert."  *Id.*  Here,

beginning in 2001, Scott Hanna and his partners at Acoustics Artistry LLC (Delaware) ran field tests, built numerous prototypes through computer engineering software, and first attempted to market the product in 2005.  Even applying this persuasive Seventh Circuit precedent, the court finds sufficient time, money, and effort involved with the WakeBlaster to constitute a product not generally known or easily duplicated in the industry.

Similarly, in *Precision Moulding*, plaintiff sued for misappropriation of trade secrets regarding "an automatic banding machine [that] hold[s] molding together as adhesive sets."  888 P.2d at 1242.  Plaintiff, who made moldings for oval-shaped glass door inserts, obtained the banding machine from another woodworking business ("Alternatives") that made moldings for oval mirror frames.  *Id.* at 1240.  Thus, plaintiff used the same banding machine as Alternatives, but applied it to a different type of molding.  The court granted summary judgment for the defendant because others in the woodworking industry could properly ascertain any and all information concerning this banding machine.  "The information was included in Alternative's employee handbook.  Furthermore, [Alternative's owner] would have shared the information with anyone.  This combined with the fact that the technology, albeit used for other applications, has been available for more than 20 years, leads inevitably to the conclusion that the information was readily available."  *Id.* at 1242.  The court concluded that the Uniform Trade Secrets Act "does not confine the relevant industry only to persons involved in a particular application of certain information

or a particular process." *Id.* Here, however, assuming "sound reinforcement" constitutes the relevant industry, the WakeBlaster concept cannot be labeled a mere "process" of generally known information in that industry. The WakeBlaster design utilizes unique data and knowledge to combine existing components into a new product—not merely an application of an existing product. Furthermore, Tardo, a sound reinforcement industry specialist, admits the data used for the WakeBlaster specifications is not readily available in the industry. *See* doc. 70, at 68, 177.

Indeed, the court finds *Penalty Kick Management Ltd. v. Coca Cola Co.*, 318 F.3d 1284 (11th Cir. 2003) (applying Georgia law), more instructive. In *Penalty Kick*, the Eleventh Circuit considered a "beverage label marketing and production process known as 'Magic Windows'" which allowed beverage consumers to view a message after emptying the beverage container. *Id.* at 1287. Some aspects of plaintiff's "Magic Windows" design and production technology existed in the public domain due to a patent application by Virtual Image. *Id.* at 1287-88. However, the court held that "even if all of the information is publicly available, a unique combination of that information, which adds value to the information, also may qualify as a trade secret." *Id.* at 1291. The Eleventh Circuit agreed with the district court that a trade secret existed because, in addition to meeting the other elements of Georgia's Trade Secrets Act:[3]

---

[3] Georgia's Trade Secrets Act defines "trade secret" as:

PKM was able to provide complete image security before the bottle was at least partially emptied, whereas the Virtual Image application indicated that previous colored filter decoding methods only provided limited image security.  Finally, nothing in the Virtual Image patent application dealt with the production elements used to produce PKM's Magic Windows labels.  With these unique aspects in mind, the district court ruled that PKM had in Magic Windows "accomplished an effective, successful and valuable integration of the public domain elements, and therefore, possessed a trade secret."

*Id.* (citations omitted).

Based on the evidence at trial, this court finds that the WakeBlaster integrated some public domain elements, but that this integration is unique in the sound reinforcement industry and not generally ascertainable.  The WakeBlaster design implores test data unknown to others in the industry to project sound at the desired range and level for towing water sports.  Thus, "the fact that some or all of the components of the trade secret are well-known does not preclude protection

---

information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:

(A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Penalty Kick*, 318 F.3d at 1291.

for a secret combination, complication, or integration of the individual elements."
*Id.* Accordingly, the court finds that AALLC satisfies this element because the
WakeBlaster meets the desired purpose of the Alabama Trade Secrets Act. *See
IMED Corp.*, 602 So. 2d at 346

   *ii. WakeBlaster not readily ascertained or derived from publicly available
information*

   For the reasons stated above, the court finds that the WakeBlaster is not
readily ascertained from publicly available information. *See* Ala. Code § 8-27-2,
comment (a)(4) ("Paragraph d is intended to disallow from trade secret protection
information that is readily available and does not require substantial research
investment to obtain."). To create the WakeBlaster prototype, Scott Hanna and his
partners performed field testing with boats and wakeboarders to collect data
regarding distances and angle decrees of the horn-in-horn speakers. Doc. 69, at
20, 24. They entered this data into the "Autocad" program to create computerized
models of the WakeBlaster speaker system. *Id.* at 23, 28. Scott Hanna then
utilized these models for clay and fiberglass prototypes of the WakeBlaster. *Id.* at
30-31. *See also* P. Trial Exh. 7, 8, 9. Thus, while Peavey correctly maintains that
the horn-in-horn speaker pre-existed the WakeBlaster, the data implemented in the
unique WakeBlaster product design is not publicly available information. *See* doc.
69, at 206-07.

*iii. WakeBlaster the subject of efforts that are reasonable under the circumstances to maintain its secrecy*

The court agrees with Peavey that "secrecy is the defining characteristic of information that is protectable under trade secret law." Doc. 73, at 17 (citing *Incase, Inc. v. Timex, Corp.*, 488 F.3d 46 (1st Cir. 2007)). *See also Allied Supply Co.*, 585 So. 2d at 36. To protect the WakeBlaster's design, Acoustic Artistry LLC (Delaware) required XTP to sign a confidentiality agreement before engaging in manufacturing discussions, P. Trial Exh. 11; AALLC also signed a confidentiality agreement with Peavey relating to the WakeBlaster, P. Trial Exh. 20. Moreover, as AALLC and Tardo engaged in business conversations about Peavey producing the WakeBlaster, AALLC continuously reminded Tardo about this non-disclosure agreement and to keep all design information confidential. *See* P. Trial Exh. 23, 24, 26. Finally, the Separation Agreement between Auditoria, Inc. and Scott Hanna contains a confidentiality clause pertaining to the WakeBlaster. P. Trial Exh. 18. The court finds such protective measures reasonable under the circumstances to maintain the secrecy of the WakeBlaster.

Peavey argues, on the other hand, that AALLC failed to maintain secrecy in the WakeBlaster because it offered marketing demonstrations to other manufacturers, such as MasterCraft, without first obtaining confidentiality agreements. Doc. 73, at 18. However, there is no evidence that these marketing demonstrations disclosed the WakeBlaster design. Indeed, Tardo alleged that, after the initial WakeBlaster demonstration to Peavey, he could manufacturer a

similar product, but needed AALLC's data to actually reproduce AALLC's WakeBlaster.  *See* doc. 70, at 68, 177, 196.  *See also* doc. 69, at 46-47.  Moreover, Peavey provided no evidence at trial that, after the WakeBlaster demonstrations, these other manufacturers possessed the information necessary to reproduce the WakeBlaster.  Rather, when AALLC actually disclosed the WakeBlaster's design scheme, it obtained confidentiality agreements.  *See* P. Trial Exh. 11, 18, 20.

Peavey also argues that AALLC failed to maintain the WakeBlaster's secrecy because it made two unrestricted sales of the product.  Doc. 73, at 21.  However, at trial, Syndi Hanna provided that they sold these units to a family member and a close friend.  Doc. 70, at 50.[4]  These private sales fail to undermine the reasonableness of AALLC's efforts to maintain the secrecy of the WakeBlaster.  Put differently, by selling WakeBlaster prototypes to close family members, the proprietary information reasonably remains outside of the public domain.  *See Picker Int'l, Inc. v. Parten*, 935 F.2d 257, 264 (11th Cir. 1991) (finding that Alabama's trade secret laws require "a substantial element of secrecy in the information") (quotation marks and citation omitted); *Mason v. Jack Daniel*

---

[4] Peavey cites *Secure Servs. Tech., Inc. v. Time and Space Processing Inc.*, 722 F. Supp. 1354 (E.D. Va. 1989), for the proposition that the "non-public sale of equipment, embodying hidden but reverse-engineerable features, to a single customer without any reservation of rights or any notification of confidentiality or any restrictive markings, constituted an unrestricted disclosure of those features, resulting in waiver of trade secret protection."  Doc. 73, at 22 n.32.  However, in *Secure Services Technology*, plaintiff sold its product to the U.S. military ("a single customer").  The court properly found that an entity failed to reasonably maintain the secrecy of a product by selling it, without reservation, to the government.  *Id.* at 1360.  Peavey unreasonably analogizes this holding to apply to a sale between family members or friends.

*Distillery*, 518 So. 2d 130, 133 ("[A]bsolute secrecy is not required . . . a substantial element of secrecy is all that is necessary to provide trade secret protection.") (quotation marks and citation omitted).  Moreover, Syndi Hanna's testimony at trial revealed an expectation of nondisclosure with both the family member and the close friend.  Doc. 70, at 50.  *See also* Ala. Code § 8-27-2, comment (a)(5) ("Some tests that may be helpful in determining what efforts are reasonable appear in comment b to Section 757 of the Restatement of Torts (1939)."); Restatement of Torts § 757, comment b (1939) (owner of trade secret may "communicate[] it to others pledged to secrecy").  In sum, as the finder of fact, the court deems AALLC's secrecy efforts reasonable to maintain "trade secret" protection under Alabama law for its WakeBlaster design.

### iv. WakeBlaster has significant economic value

The facts at trial demonstrate that the WakeBlaster maintains significant economic value, despite no current realization of this value.  Tardo testified, based on his substantial experience in the sound reinforcement industry, that Peavey's HammRheadZ product, created from the WakeBlaster prototype, had the potential to sell.  Doc. 70, at 156.  Tardo also testified that the marine acoustics division of Peavey, created to further develop the WakeBlaster, could have economic value for the company.  *Id.* at 165.  Finally, although Courtland Gray testified at trial—in response to a question about the WakeBlaster's economic value—that he "really didn't want to bring the product to Peavey," Gray previously stated at deposition that he found the product potentially profitable and unique.  *Id.* at 220-

27.  Moreover, when Hanna attempted to recover certain property rights from the
"wakeboard speaker designs" after Peavey discharged him, Peavey's general
counsel responded in a letter that Peavey "will aggressively pursue any violation"
of the July 18, 2008 Confidentiality Agreement.  P. Trial Exh. 53.  Ultimately, the
WakeBlaster product design retains sufficient economic value to warrant "trade
secret" status.  Although Peavey points to evidence that other manufacturing
companies rejected the WakeBlaster, *see* doc. 73, at 26, Peavey created a new
marine acoustics division specifically for development of the WakeBlaster
prototype.  Doc. 70, at 116.  Peavey also contends that it has actually lost money
on development of the WakeBlaster project.  Doc. 73, at 27.  However, the court
also rejects this argument because many new inventions lose money before turning
a profit, and such business reality fails to demonstrate that a product lacks
"significant economic value."

In the same vein, Peavey argues that Alabama's Trade Secret Act requires
*more* than "potential value, or even actual value, [] it must instead have significant
economic value."  Doc. 73, at 24 (citing *Unisource Worldwide, Inc. v. S. Cent.
Ala. Supply, LLC*, 199 F. Supp. 1194 (M.D. Ala. 2001)).  However, the contention
that a plaintiff may only rely on realized financial profit finds no basis in the law,
and indeed, Comment (a)(6) to Ala. Code § 8-27-2 provides that the "trade secret
statute . . . is designed to encourage exploitation of information that *can* provide
valuable goods or services to the public.  The value of a trade secret may result

from its present use *or from its intended use . . . .*" *Id.* (emphasis added).[5]

Therefore, given that Peavey admits to the WakeBlaster's potential economic value, the court finds that AALLC satisfies this final prong under Ala. Code § 8-27-2, and the WakeBlaster design constitutes a trade secret under Alabama law.

## IV.   CONCLUSION

Pursuant to the parties' directive regarding Phase I of this litigation, the court merely finds that AALLC retains a trade secret in the WakeBlaster design. The court refuses to reach any liability determination,[6] but allows this litigation to proceed to Phase II, or the liability and damages phase.  The parties are **ORDERED** to submit a proposed discovery plan for the remainder of this case by **April 21, 2012.**

Done the 30th day of March, 2012.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

---

[5] Moreover, the court finds it hard to reconcile Peavey's contradictory arguments regarding the sale of WakeBlaster units.  Peavey first contends that AALLC waived its right to "trade secret protection" because it sold two WakeBlaster units.  Doc. 73, at 22.  However, in the next paragraph of its brief, Peavey argues that "Plaintiff has failed to establish that the Wakeblaster has significant economic value.  In fact, since the speaker was originally developed only two (2) speaker systems have been sold." *Id.* at 23.  This irreconcilable paradox lends support to the availability of *potential* economic value.  In other words, to protect a new product's economic value, the owner may choose not to place such product on the market until perfected.  It defies logic that the product's owner retains *no* trade secret rights until the product is actually sold for profit, and only then demonstrates that a product has "significant economic value."

[6] AALLC appears to demand liability determinations in its post-trial brief.  *See* doc. 72, at 18-24.